**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **TRAVIS LANE,** | **Civil Action No. 15-4108 (FLW)** |
| **Petitioner,** | |
| **v.** | **OPINION** |
| **THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, et al.,** | |
| **Respondents.** | |

This matter has been opened to the Court by Petitioner Travis Lane's ("Lane," "Petitioner," or "defendant") filing of a Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Having reviewed the Petition, Respondent's Answer, Petitioner's Traverse, and the relevant record, the Court denies the Petition for the reasons stated in this Opinion, and also denies a certificate of appealability ("COA").

I.     **FACTUAL BACKGROUND[1] AND PROCEDURAL HISTORY**

Defendant was convicted after a 2007 jury trial of first-degree aggravated manslaughter, N.J.S.A. 2C:11–4, as a lesser-included offense of purposeful murder, N.J.S.A. 2C:11–3; first-degree felony murder, N.J.S.A. 2C:11–3(a)(3); first-degree armed robbery, N.J.S.A. 2C:15–1; and third-degree possession of a weapon, a knife, for an unlawful purpose, N.J.S.A. 2C:39–4(d). Defendant committed the offenses when he was seventeen years old, but was tried as an adult. After merger, the court sentenced defendant to a forty-year term, with an eighty-five percent parole bar pursuant to the No Early Release Act ("NERA"), N.J.S.A. 2C:43–7.2. The Appellate

---

[1] The facts are taken from the record, including the Appellate Division's decisions denying Petitioner's direct appeal and petition for postconviction relief.

Division affirmed the conviction and sentence on direct appeal.  *See* Exhibit 28, *State v. Lane*, No. A–2238–07 (App. Div. Apr.13, 2010).  The Supreme Court of New Jersey denied certification.  *State v. Lane*, 203 N.J. 96 (2010).

Petitioner filed a PCR on or about October 27, 2010, asserting claims of ineffective assistance of counsel.  *See* Exhibit 29.  On December 9, 2011, the PCR Court denied the PCR without an evidentiary hearing.  *See* Exhibit 31; *see also* Exhibit 24.  The Appellate Division affirmed the denial of Petitioner's PCR on August 12, 2014.  *See* Exhibit 34.  The Supreme Court of New Jersey denied certification on February 5, 2015.  *State v. Lane*, 220 N.J. 573 (2015).

Petitioner submitted the instant Petition on or about June 12, 2015.  *See* ECF No. 1, at 13. Petitioner sought to amend his Petition to exhaust claims brought in a second PCR in state court. *See* ECF Nos. 5, 10, 11.  The Court denied Petitioner's stay motions without prejudice.  ECF Nos. 9,  18.  On April 16, 2018, Petitioner sought to withdraw his Amended Petition and proceed on his Original Petition, which contains two grounds for relief.  *See* ECF Nos. 21.  The Court directed Respondents to Answer the Original Petition.  *See* ECF No. 22.

When Respondents failed to Answer, the Court issued a second Order to Answer on December 7, 2018, and Respondents filed their Answer on January 18, 2019.  *See* ECF Nos. 25, 27.  Petitioner filed his traverse on February 4, 2019.  ECF No. 28.

## II.    <u>STANDARD OF REVIEW</u>

Section 2254(a) permits a court to entertain only claims alleging that a person is in state custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  Petitioner has the burden of establishing each claim in the petition.  *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013).  Under 28 U.S.C. § 2254, as amended by the

Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, Pub. L. No. 104-132, tit. I, §

101 (1996), 28 U.S.C. § 2244, federal courts in habeas corpus cases must give considerable

deference to determinations of state trial and appellate courts. *See Renico v. Lett*, 599 U.S. 766,

772 (2010).

Section 2254(d) sets the standard for granting or denying a writ of habeas corpus:

> (d) An application for a writ of habeas corpus on behalf of a person
> in custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the
> merits in State court proceedings unless the adjudication of the
> claim-
>> (1) resulted in a decision that was contrary to, or involved
>> an unreasonable application of, clearly established Federal
>> law, as determined by the Supreme Court of the United
>> States; or
>> (2) resulted in a decision that was based on an unreasonable
>> determination of the facts in light of the evidence presented
>> in the State court proceeding.

28 U.S.C. § 2254(d).

Where a state court adjudicated a petitioner's federal claim on the merits,[2] a federal court

"has no authority to issue the writ of habeas corpus unless the [state c]ourt's decision 'was

contrary to, or involved an unreasonable application of, clearly established Federal Law, as

determined by the Supreme Court of the United States,' or 'was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding.'"

*Parker v. Matthews*, 567 U.S. 37, 40-41 (2012) (quoting 28 U.S.C. § 2254(d)).

"[C]learly established law for purposes of § 2254(d)(1) includes only the holdings, as

---

[2] "For the purposes of Section 2254(d), a claim has been 'adjudicated on the merits in State court proceedings' when a state court has made a decision that (1) finally resolves the claim, and (2) resolves th[at] claim on the basis of its substance, rather than on a procedural, or other, ground." *Shotts v. Wetzel*, 724 F.3d 364, 375 (3d Cir. 2013) (citation and internal quotation marks omitted).

3

opposed to the dicta, of t[he Supreme Court's] decisions," at of the time of the relevant state-court decision. *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).  A decision is "contrary to" a Supreme Court holding within 28 U.S.C. § 2254(d) (1) if the state court "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result." *Williams*, 529 U.S. at 405-06.  Under the "'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e] [Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. As to 28 U.S.C. § 2254(d)(1), a federal court must confine its examination to evidence in the record.  *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).

Where a petitioner seeks habeas relief, pursuant to § 2254(d)(2), on the basis of an erroneous factual determination of the state court, two provisions of the AEDPA necessarily apply. First, the AEDPA provides that "a determination of a factual issue made by a State court shall be presumed to be correct [and] [t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  29 U.S.C. § 2254(e)(1); *see Miller–El v. Dretke*, 545 U.S. 231, 240 (2005).  Second, the AEDPA precludes habeas relief unless the adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

A petition for a writ of habeas corpus "shall not be granted unless ... the applicant has exhausted the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1); *Wilkerson v. Superintendent Fayette SCI*, 871 F.3d 221, 227 (3d Cir. 2017).  This Court may, however,

deny petitioner's unexhausted claim on the merits. 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

## III.   ANALYSIS

### a.  Ground One

In Ground One, Petitioner contends that the Appellate Division unreasonably applied clearly established federal law in affirming the trial court's denial of Petitioner's motion to suppress his confession and finding that Plaintiff's confession was knowing and voluntary.

The Appellate Division provided the following factual background for this claim:

> The State's proofs can be summarized as follows. On September 11, 2004, Hernandez lived in Neptune with his aunt (Clotilde Hernandez), Eligio Aguilar, and several others. He was a recent immigrant from Mexico. That day, Hernandez went to a store to buy an international phone card. He went there on a bicycle he had recently purchased for $78. Around 6:30 p.m., Hernandez's aunt heard him knocking "desperately" on the front door. Upon opening it, she saw Hernandez bleeding profusely from a neck wound. He told her, "They stole the bike from me and I was stabbed." The aunt screamed for Aguilar. Hernandez told Aguilar, "They robbed my bicycle and wounded me." Hernandez pointed at the perpetrators down the street. Aguilar saw someone riding Hernandez's bicycle with another person running next to him. Aguilar immediately drove Hernandez to the hospital. Hernandez lapsed into unconsciousness and was pronounced dead later that night.

> Fifteen-year-old Zane (E.J.) McBride testified that he was riding his bike when he saw Hernandez on a bicycle. Defendant was behind Hernandez and someone on a green bike was behind defendant. Defendant ran up and hit Hernandez in the back of the head. Hernandez hit defendant back on the chin. Defendant "jumped in the street with his hands out" hitting Hernandez again. Hernandez got off his bike and ran into the house screaming something in Spanish. Defendant then got on the bike and rode it toward a nearby deli. McBride gave a statement to the police and identified defendant's photograph as portraying the person who attacked Hernandez.

Sixteen-year-old Antonio Delaney testified that he was near defendant's house when he saw an altercation between defendant and Hernandez. Delaney saw defendant run past him with a knife and hit Hernandez in the lower jaw area as Hernandez was riding his bicycle. After Hernandez fell to the ground, defendant got on Hernandez's bike and rode away. Hernandez held his neck as defendant rode off on the bike.

Fourteen-year-old Albert Miles testified that he did not recall any conversation he had with defendant despite having given a statement to the police to the contrary. He acknowledged the statement given was, however, accurate. In his statement, Miles indicated that the day after Hernandez's death, defendant said "I killed the Mexican." Defendant told Miles that "he went over across the street and he hooked the Mexican and the Mexican hooked him back." By hooking, Miles meant defendant "took a swing at him." Defendant told Miles he had stabbed Hernandez in the neck and took his bike.

As a result of the information received, Neptune Detectives Barry DuBrosky and Eugene Stewart arrested defendant at his school four days after the stabbing. Defendant was called to the principal's office and upon his arrival he was placed under arrest, patted down, and handcuffed. The detectives then took him to the Neptune Police Department where his mother, Edith Fuller, was waiting. Detective DuBrosky explained to Fuller that because defendant was not an adult, she would need to give permission for the detectives to question him. Fuller agreed and defendant also agreed that he would speak with them.

DuBrosky presented defendant with a *Miranda*[3] warning and waiver form. After each of the five *Miranda* warnings was read aloud, both defendant and Fuller initialed the appropriate section and signed at the end of the form. Detectives DuBrosky and Stewart then signed the form and recorded the date and time: September 15, 2004, at 1:22 p.m.

Defendant initially denied any wrongdoing. He told the detectives that he was playing basketball with friends and filling out job applications the day Hernandez was murdered. He said he came back to his house that afternoon and was sitting in his backyard when McBride came running and told him that "a Mexican got cut in front of the house." Defendant said he did not react to McBride's statement and instead carried on his

---

[3] "*Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1966)." *State v. Lane*, No. 05–05–1205, 2010 WL 1526360, at *2 n.1 (N.J. Super. App. Div. Apr. 13, 2010).

conversation. He said he had a hard time sleeping that night because he was thinking about his recently deceased grandmother.

DuBrosky asked defendant if he had a hard time sleeping because he had killed Hernandez. Defendant said, "I was in Belmar, ask [McBride]." DuBrosky then told defendant and Fuller that the reason he was arrested was because there were statements by witnesses against him. Defendant still repeatedly insisted that they "ask [McBride]" to verify his story.

DuBrosky asked defendant how he would feel if someone killed his mother or sister. Defendant did not respond. The detective then asked how he would feel if someone had killed his grandmother for a bicycle. Defendant looked at his mother and became angry. He clenched his fists and was breathing heavy, almost snorting. DuBrosky raised his voice and said, "You've got to be kidding me. I'm pissing you off. You kill a man for a $78 bicycle and I'm fucking pissing you off? You've got to be kidding me." Defendant was mad and again insisted several times that they "ask [McBride]" to verify his story.

At that point in the questioning, Neptune Deputy Chief Guy McCormick knocked on the door and asked the detectives to leave so that he could talk to defendant alone. McCormick came out five minutes later and told the detectives that defendant had just seen McBride's statement and that they should go back in to continue the questioning.

When the detectives re-entered the room, defendant was somber and Fuller seemed very upset. DuBrosky told defendant he needed to be honest with them and his mother. Defendant then stood up from his chair and said, "I'm sorry, I did it." He then walked over to his mother and hugged her, repeatedly saying he was sorry.

After a short bathroom break, defendant agreed to give a formal statement. The statement began at 3:06 p.m., ended at 4:12 p.m., and was ten pages long. Defendant said that he alone was responsible for the stabbing, which was unintentional. He said that he was truly sorry. He denied taking the bicycle. Defendant reviewed the statement with the detectives, which was documented by video recording. Both defendant and Fuller initialed the bottom of each page to indicate that the contents were accurate.

Eleven months later, defendant wrote a letter to DuBrosky asking to speak with him as soon as possible. Defendant wrote:

> [Y]ou should know that [had I] not made the statement ... [t]he real person responsible for this crime threatened me with the same result as the

victim. I was in fear for my life as well as the lives of my family."

A second letter was sent to the Monmouth County Prosecutor's Office on July 5, 2005. This letter used the same exact language.

Defendant later testified that he did not stab Hernandez. According to defendant, the letters he sent were lies and he had never been threatened by the "real person" who committed the crime. Instead, he claimed that it was the police who threatened him. He testified that DuBrosky threatened to ask for the death penalty if he did not give a statement and sign the *Miranda* form. Defendant testified, "I was scared of the death penalty, and I was tired of them saying those things about my grandmother and my family. So, I just told them ... what they wanted to hear, and made up a story." He said he signed the *Miranda* form to be "cooperative," but did not understand what it meant.

Prior to trial, defendant moved to suppress his confession. A hearing was held to determine whether defendant was competent to understand the waiver form and to voluntarily, knowingly, and intelligently waive his rights.

Mark Siegert, Ph.D., a psychologist, testified as an expert for the defense. Siegert met with defendant on five occasions and reviewed all documents related to the case, including the videotaped confession, as well as defendant's school records. These records indicated that when defendant was almost eight years old, his testing in math, reading, recognition, and general information put him at an equivalent of less than five years old. Around this time, the school classified defendant as neurologically impaired and "educably mentally retarded" (with an IQ of sixty-three) and placed him in a special school. He was also diagnosed with Attention Deficit Hyperactivity Disorder (ADHD).

Siegert performed a long list of IQ and competency tests. One test revealed "significant distortions in his ability to see, process, and reproduce simple geometric shapes." When asked to draw the face of a clock, defendant did not know if there were twelve or thirteen numbers and then placed the numbers out of order. Defendant did not know the name of the current or past U.S. President, and said "I don't even know who the mayor of New Jersey is." In Siegert's opinion, defendant's drawings of houses, trees, and people were of the types of drawings that "very, very young children" create.

Siegert then administered the Wechsler Adult Intelligence Scale Three Test. Defendant's verbal score was a sixty-nine and his full scale score was sixty, placing him in the first percentile,

8

meaning that 99% of people his age scored higher. More testing revealed that 99.9% of people his age scored better in listening, listening vocabulary, listening grammar, speaking ability, reading, and writing ability. These scores placed Defendant in the mild range of mental retardation.

In terms of specifically testing defendant's ability to understand the *Miranda* warnings, Siegert used the Grisso test, also called "Understanding and Appreciation of the *Miranda* Rights Assessment." In this test, Siegert first asked defendant to say in his own words what he thought the *Miranda* warning meant. Next Siegert used substituted words and asked defendant whether the statements were then the same or different from the ones in the *Miranda* warning. Only 4.5% of offenders scored as low or lower than defendant did on understanding *Miranda* rights.

After performing the evaluations of defendant, Siegert concluded as follows:

> I found Travis Lane to be mentally retarded with an IQ less than 70, cognitive deficits beginning before age 18 and more than two significant adaptive skill deficits.... I found him to have severe ADHA.... [H]is language deficits are below the first percentile in all measured tasks, that not only would render his ability to understand what is said in the courtroom as inadequate, but combined with other cognitive deficits and his ADHA, it rendered him in my opinion unable to understand the *Miranda* warning at the time. And I noted there that when [defendant] does not understand something he acts as if he does understand it. That's part of his preserving his self-esteem and trying to act like a man.

> I found his reading level to be at the third grade or the first percentile. And I do not believe he could have understood the *Miranda* warning in terms of beyond—I think he could read many of the words, not all of them, but I don't believe in real time and without teaching he could have understood the meaning of them on the *Miranda* form. I noted his memory even both immediate and at a gap of [twenty] minutes as severely deficient, below 0.1st percentile. And that would affect his ability to remember the warning given verbally and read and process[ ] what that means so he could weigh or understand the meaning of it.

Louis Schlesinger, Ph.D, a psychologist, testified as the State's expert witness. Schlesinger found Siegert's testing to be flawed. Most notably, Schlesinger disagreed with the use of the Grisso test and Siegert's conclusion that defendant did not understand the *Miranda* warnings. The Grisso test uses a *Miranda* form with different language than the one used by the Neptune Police Department and signed by defendant.

In Schlesinger's opinion, defendant was fully capable of understanding the *Miranda* warnings. Schlesinger reviewed the actual Neptune *Miranda* form with defendant and asked him to say in his own words what each of the warnings meant. Schlesinger also administered the Grisso test and felt that even though that form was more advanced than the Neptune form, defendant's answers satisfactorily demonstrated that he understood his *Miranda* rights when he waived them.

Schlesinger also testified that there were errors in the other tests that Siegert administered to defendant. Schlesinger detailed numerous questions where defendant had received a zero score from Siegert, but when asked the same question again by Schlesinger defendant gave an answer worthy of half or full credit. Schlesinger said Siegert failed to ask appropriate follow-up questions when defendant refused to answer or gave a vague answer. Additionally, Schlesinger found calculation errors in Siegert's results. When Siegert's results were recalculated, defendant's verbal IQ was a seventy-eight, not a sixty-nine as Siegert originally found. This placed defendant in the borderline to low average range for verbal intelligence.

After performing a number of other tests, Schlesinger concluded that defendant was not mentally retarded. He noted that in 1999, a psychiatrist had also found that defendant had "borderline intellectual functioning" and was not mentally retarded. Ultimately, Schlesinger presented the following conclusions to the court:

> [Defendant] is not mentally retarded according to diagnostic criteria. He has attention deficit hyperactivity disorder of a hyperactive impulsive type, he has conduct disorder that's now developed into a personality disorder, with antisocial and impulsive traits. He has a history of alcohol and marijuana abuse. I also found some mild organicity and a learning disability. But he was completely competent to make a free, knowing, and voluntary waiver of his Miranda rights when they [were] read to him when he was arrested.

10

The judge also heard testimony from defendant, his mother, and the detectives. Fuller gave conflicting testimony. At first she said she heard DuBrosky threaten her son with life imprisonment if he did not make a statement. After the hearing recessed for lunch, Fuller testified during cross-examination that DuBrosky had threatened defendant with the death penalty.

The judge denied defendant's motion to suppress the statement. The judge found that defendant and Fuller were not credible witnesses because of inconsistencies in their testimony concerning the threats they alleged DuBrosky made. In contrast, the trial judge found that the detectives were credible and their testimony was supported by documentary evidence such as the signed waiver form, the written statement, and the videotaped review of the statement. The judge found that defendant's statement was voluntarily given.

On the issue of defendant's ability to understand the Miranda warnings, the judge found that both expert opinions "were really outweighed by the lay evidence ... [i]ncluding the testimony of [defendant.]" This lay evidence led to the conclusion that "[defendant] demonstrated sufficient intelligence to understand his *Miranda* rights. The judge noted defendant's school difficulties, but concluded that "understanding *Miranda* is really not that complicated." The judge found Schlesinger's testimony "more in accord with the court's findings in evaluation of that lay testimony" and that "Siegert passed the stage of being an impartial expert to that of being [Defendant's] advocate."

*State v. Lane*, No. 05–05–1205, 2010 WL 1526360, at *1–5 (N.J. Super. App. Div. Apr. 13, 2010).

The Appellate Division analyzed Petitioner's claim that his confession was not knowing and voluntary under the totality of the circumstances, and rejected it as follows:

It is settled that "[c]onfessions obtained by the police during a custodial interrogation are barred from evidence unless the defendant has been advised of his or her constitutional rights." *State v. Knight*, 183 N.J. 449, 461, 874 A.2d 546 (2005). A waiver of the constitutional right against self-incrimination must be voluntary, knowing, and intelligent. *Ibid.* (citing *Miranda*, *supra*, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L. Ed.2d at 707). In New Jersey, the burden is upon the State to prove the validity of a *Miranda* waiver beyond a reasonable doubt. *State v. O'Neill*, 193 N.J. 148, 168 n. 12, 936 A.2d 438 (2007).

11

New Jersey utilizes the "totality of the circumstances" test to determine the validity of a waiver. *Knight, supra*, 183 N.J. at 462–63, 874 A.2d 546. The factors include personal characteristics such as the defendant's age, education, and intelligence, as well indicators of the nature of the interrogation, such as the length in detention and whether physical or mental exhaustion were involved in obtaining the confession. *Ibid.* Courts also consider a defendant's previous interactions with law enforcement and the length of time between the administration of the warnings and the given statement. *Id.* at 463, 874 A.2d 546.

At the time of arrest, defendant was seventeen. Whether a parent was present when a juvenile's confession is given is a "highly significant factor" in determining whether a waiver is valid. *State v. Presha*, 163 N.J. 304, 315, 748 A.2d 1108 (2000). As is required by N.J.S.A. 2A:4A–33, the police officers contacted defendant's mother at the time of his arrest. She was present at the time he signed the *Miranda* form, when the statement was given, and when the statement was reviewed.

The crux of defendant's argument that his *Miranda* waiver was invalid rests upon his alleged "severe intellectual deficiencies" and "significantly impaired educational and mental characteristics." Defendant cites *State in the Interest of S.H.*, 61 N.J. 108, 115, 293 A.2d 181 (1972), and argues "[a person] cannot make a knowing and intelligent waiver of something he cannot understand." Defendant concedes that a limited intelligence "does not necessarily render [a waiver] involuntary in nature," but argues that according to *State v. Flowers*, 224 N.J. Super. 208, 214, 539 A.2d 1284 (Law Div.1987), aff'd o.b. 224 N.J. Super. 90, 539 A.2d 1223 (App.Div.1989)), those with a diminished mental capacity must be "treated differently [than] adults who are presumed to be responsible."

A defendant's IQ is not dispositive in determining whether *Miranda* warnings were understood. *State v. Carpenter*, 268 N.J. Super. 378, 385, 633 A.2d 1005 (App. Div.1993), certif. denied, 135 N .J. 467, 640 A.2d 848 (1994). Nor does participation in special education courses, illiteracy, or even mild retardation automatically render a *Miranda* waiver invalid. *Ibid.* Instead, "each case must be examined on an individual basis." *Ibid.*

Our standard of review of a trial court's findings as to the admissibility of a defendant's confession is the "sufficient credible evidence" standard. *State v. Elkwisni*, 384 N.J. Super. 351, 366, 894 A.2d 1180 (App. Div.2006), aff'd, 190 N.J. 169, 919 A.2d 122 (2007). Thus, reversal will occur only if the trial court's findings "are not supported by substantial credible evidence." *Ibid.* Here, the judge found Schlesinger to be the more credible expert witness

12

and believed that Siegert had moved from being an impartial expert to an advocate for defendant. More importantly, the judge found that both expert opinions "were really outweighed by the lay evidence ... [i]ncluding the testimony of [defendant.]" From our review of the record, we conclude that the judge's finding that defendant understood the *Miranda* warnings was based on sufficient evidence in the record.

A final step in the totality of the circumstances test is looking at the nature of the interrogation. *Knight, supra*, 183 N.J. at 462–63, 874 A.2d 546. Defendant claimed DuBrosky threatened him with the death penalty if he did not cooperate, while his mother gave conflicting testimony. The judge found neither credible and instead believed the testimony of the detectives and Chief McCormack who said no threats were ever made. We give deference to the trial judge on issues of credibility. *N.J. Div. of Youth & Family Servs. v. G.L.*, 191 N.J. 596, 695, 926 A.2d 320 (2007).

The length of defendant's detention prior to the confession does not render the statement involuntary. *See Knight, supra*, 183 N.J. at 468–69, 874 A.2d 546 (finding a detention that lasted the length of a "daytime work shift" would not render a waiver involuntary); *State v. Morton*, 155 N.J. 383, 450, 715 A.2d 228 (1988) (a nine-and-a-half hour interrogation did not render waiver involuntary). Finally, the time that lapsed between the administration of *Miranda* warnings and defendant's statement was minimal, as less than two hours passed. We thus conclude that the judge's finding that defendant's statement was voluntarily given must be affirmed.

*State v. Lane*, 2010 WL 1526360, at *6–7.

Here, the Appellate Division carefully examined Petitioner's claim that his confession was not knowing and voluntary and did not unreasonably apply clearly established federal law or unreasonably determine the facts in resolving his claim.

*Miranda* provides that the accused may waive his rights, but must do so "voluntarily, knowingly and intelligently. 384 U.S. at 475. In determining whether there has been a valid waiver of *Miranda* rights, a court must conduct a two-part inquiry under a totality of the circumstances standard. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). First, the court looks to the voluntariness of the statement, and whether the waiver was freely and deliberately given as opposed to being obtained by coercion, intimidation, or deception. *Id.* Second, the court must

consider whether the waiver was "knowingly and intelligently" made, that is, whether the accused was fully aware "both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

The Supreme Court has held that the "totality of the circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved." *Fare v. Michael C.*, 442 U.S. 707, 725 (1979). This approach includes the evaluation of the juvenile's age, education, experience, background, and intelligence, enabling the court "to take into account those special concerns that are present when young persons, often with limited experience and education and with immature judgment, are involved." *Id. See also Yarborough v. Alvarado*, 541 U.S. 652 (2004) (the characteristics of the defendant can include the defendant's age, education, and intelligence, as well as his prior experience with law enforcement).

Further, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). Absent police overreaching, which is causally related to the confession, "there is simply no basis for concluding that a state actor has deprived a criminal defendant of due process of law." *Id.* at 164. Thus, beyond the necessary and crucial element of police coercion, courts look to both the characteristics of the accused and the circumstances of the interrogation in considering whether a confession is voluntary. *See, e.g., Withrow v. Williams*, 507 U.S. 680, 693–94 (1993) (concluding that the voluntariness of the confession depends upon the totality of circumstances, including police coercion, length and place of interrogation, the accused's maturity, education, physical condition, intelligence, and mental health, as well as 'the failure of the police to advise the defendant of his rights to remain

silent and to have counsel present during the custodial interrogation."); *Scneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (the voluntariness of a statement may often depend on whether the accused's will was overborne, a question that logically turns on the characteristics of the accused).

Although the state bears the burden at trial of proving that a confession was voluntary, this burden shifts on collateral review; a habeas petitioner must prove by a preponderance of the evidence that his or her confession was involuntary.  *Miller v. Fenton*, 796 F.2d 598, 604 (1986). On collateral review, the reviewing court has a duty "to examine the entire record and make an independent determination of the ultimate issue of voluntariness." *Davis v. North Carolina*, 384 U.S. 737, 741-42 (1966); *accord Beckwith v. United States*, 425 U.S. 341, 348 (1971). Moreover, under 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."; *see also Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) ("federal habeas courts [have] no license to re-determine credibility of witnesses whose demeanor has been observed by the state trial court").

The Supreme Court has considered low intelligence and youth, along with other factors, in assessing whether a confession was obtained in violation of a defendant's due process rights. *See e.g., Reck v. Pate*, 367 U.S. 433, 441-42 (1961) (finding that confession of 19 year-old defendant of low intelligence held incommunicado, without food, physically weakened and in pain for four consecutive days of six-to seven-hour continuous interrogation was obtained in violation of due process); *Gallegos v. Colorado*, 370 U.S. 49, 55 (1962) (finding that confession made by fourteen year old boy who was held for five days without sending for his parents or a lawyer was obtained in violation of due process).  But in less extreme cases, courts have often

found valid waivers with respect to custodial confessions in cases involving juveniles and persons with low I.Q.s, such as Petitioner in this case.  *See Winfrey v. Wyrick*, 836 F.2d 406 (8th Cir.1987) (valid waiver from 17 year old with low I.Q.), *cert. denied sub nom. Winfrey v. Armontrout*, 109 S.Ct. (1988); *Vance v. Bordenkircher*, 692 F.2d 978 (4th Cir. 1982) (valid waiver from 15 year old with I.Q. of 62, no lawyer or parent present), *cert. denied*, 464 U.S. 833 (1983); *Miller v. Maryland*, 577 F.2d 1158 (4th Cir.1978) (valid waiver from 16 year old with respect to a charge of murder); *Williams v. Peyton*, 404 F.2d 528, 530 (4th Cir.1968) ("youth by itself is not a ground for holding a confession inadmissible"); *United States v. Miller*, 453 F.2d 634 (4th Cir.1972) (valid waiver by 14 year old defendant), *cert. denied*, 406 U.S. 923 (1972). Thus, Petitioner's "youth and intelligence level does not make the confession involuntary as a matter of law[.]" *See Vance*, 692 F.2d at 981.

Here, the trial court analyzed whether Petitioner's confession was voluntary under the totality of the circumstances, consistent with clearly established federal law. The Appellate Division affirmed the trial court's determinations that Petitioner understood the *Miranda* warnings and that his confession was not the product of coercion, and Petitioner has not met his burden to show otherwise.  In finding that Petitioner understood the *Miranda* warnings, the trial court found the state's expert to be the more credible expert witness regarding Petitioner's level of intelligence and comprehension abilities and also relied on Petitioner's own testimony.  And although Petitioner and his mother claimed that the detectives threatened Petitioner during questioning, the trial court did not find them credible and relied on the detectives' and Chief McCormack's testimony that no threats were made.  Petitioner has not provided clear and convincing evidence contradicting any of the trial court's findings.  The remaining factors, *i.e.*, the presence of Petitioner's mother during the interrogation and the relatively short time between

16

the issuing of the *Miranda* warnings and the confession also weigh in factor of voluntariness.

For these reasons, the Appellate Division's denial of Petitioner's claim is not an unreasonable

application of clearly established federal law regarding knowing and voluntary confessions and

does not amount to an unreasonable determination of the facts in light of the evidence presented

at the suppression hearing.  The Court denies habeas relief as to Ground One.

### b.  Ground Two

In Ground Two of his Petition, Petitioner contends that he was deprived of his Sixth

Amendment right to the effective assistance of counsel based on trial counsel's failure 1) to

adequately investigate the credentials of the defense expert, Siegert, or 2) to ask for a

continuance to hire a new expert when counsel discovered that Siegert had "falsified" his

credentials.  Plaintiff's ineffective assistance of counsel claim is governed by the standard set

forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which constitutes "clearly established

Federal law" for AEDPA purposes.  *Williams v. Taylor*, 529 U.S. 362 (2000); *Rainey v. Varner*,

603 F.3d 189, 197 (3d Cir. 2010).

A habeas petitioner asserting a claim under *Strickland* must establish two elements.

"First, the defendant must show that counsel's performance was deficient.  This requires a

showing that counsel made errors so serious that counsel was not functioning as the 'counsel'

guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.  In evaluating

counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls

within the wide range of reasonable professional assistance[.]" *Id.* at 689.  Thus, counsel's

performance will be deemed deficient only if it "fell below an objective standard of

reasonableness." [4]   *Id.* at 688.  The question ultimately is "whether, in light of all the circumstances, the [challenged] acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690.  "Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id.* at 687.  To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.

The Appellate Division summarized the factual background of Plaintiff's ineffective assistance claim and the PCR court's assessment of that claim as follows :

> At trial, as the sole defense witness, defendant repudiated his confession and insisted, as he did initially to police, that he was in Belmar when the crime was committed. He asserted a third party committed the offense. He also claimed his confession was the product of the death penalty threat and his desire to tell the police what he believed they wanted to hear. The defense did not call defendant's mother. The defense also did not call Siegert at trial, but defendant still testified that he did not understand the Miranda warnings.
>
> Defense counsel stated on the record, after the State rested, that he had determined, in consultation with defendant and his mother, not to call Siegert at trial because he had learned that Siegert had embellished his qualifications and was subject to impeachment. We quote at length from defense counsel's statement:

---

[4] Moreover, when § 2254(d) applies, as it does here, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."  *Harrington v. Richter*, 562 U.S. 86, 105 (2011).  On the one hand, "courts may not indulge 'post hoc rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions" *Id.* at 109.  On the other hand, *Strickland* "calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Id.* at 110 (citing *Strickland*, 466 U.S., at 688).

One of the issues at that Miranda hearing was whether Mr. Lane was competent to understand and waive his Miranda warnings.

I called an expert witness, a psychologist, who was qualified by your Honor among other things, [in] the area of forensic psychology....

....

During the course of this trial, I believe it was last week, [the prosecutor] supplied me with some transcripts where Dr. Siegert—Dr. Mark Siegert, who testified in [the] Miranda Hearing for the defense, testified in two separate cases.

....

As a result of reading those transcripts over the weekend there were some serious questions as to whether Dr. Siegert either intentionally or unintentionally, I prefer to think unintentionally, misstated his qualifications on both the website that he has and his curriculum vitae.

For example, he conceded that he had no formal training in forensic psychology. He had participated in several workshops in forensic psychology. But certainly had no formal training in [it].

He also indicated that he was a professor at Harvard University. He had to concede during cross-examination on the voir dire by the assistant prosecutor in Middlesex County that he was not a professor at Harvard University. He had been affiliated with Cambridge Hospital and through his affiliation with Cambridge Hospital he did have dealings, perhaps taught a course at Harvard but was not a professor at Harvard.

Based upon that, based upon my feelings concerning his testimony in front of your Honor at the *Miranda* Hearing, I reached a decision, which Mr. Lane concurs with—and I can get his confirmation on the record. That it would be against Mr. Lane's interest for me to present to this jury Dr. Siegert and make the argument that Mr. Lane was incompetent of understanding and waiving his *Miranda* rights.

I discussed that with Travis. I discussed that with Travis' mother who—was in court during the entire

trial.... And we reached a general consensus that we
would not be calling Dr. Siegert to testify.

Defendant then agreed on the record that he conferred with his
attorney and understood that "by not having Dr. Siegert testify in
front of the jury we are not going to argue to the jury that you were
incompetent to understand and waive your *Miranda* rights." He
also agreed it would "be wise and in your best interest not to call
Dr. Siegert."

The thrust of defendant's PCR petition is that trial counsel was
ineffective by failing to adequately investigate Siegert's
qualifications, and then by failing to ask for a continuance to hire a
new expert.

. . . .

Judge Francis P. DeStefano denied the petition in a written
decision. The judge applied the well-settled two-prong test for
determining such claims. *See Strickland v. Washington,* 466 U.S .
668, 687, 694, 104 S.Ct. 2052, 2064, 2068, 80 L. Ed.2d 674, 693,
698 (1984) (defendant must establish (1) that his counsel's
performance was deficient and he made errors so serious that
counsel was not functioning as guaranteed by the Sixth
Amendment and (2) that defendant was prejudiced such that there
existed a reasonable probability that, but for counsel's
unprofessional errors, the result would have been different); *State
v. Fritz,* 105 *N.J.* 42, 58 (1987) (adopting *Strickland* standard).

Judge DeStefano rejected defendant's argument that his trial
counsel was ineffective by failing to investigate Siegert's
background. The court found persuasive *Skaggs v. Parker,* 235
*F.*3d 261 (6th Cir.2000), *cert. denied,* 534 *U.S.* 943, 122 *S.Ct.* 322,
151 *L. Ed.*2d 241 (2001), in which the court declined to find a trial
counsel ineffective for failing to investigate the credentials of a
purported psychological expert. In that case, the "expert"
completely falsified his credentials, and had not even graduated
from college. However, the trial counsel was not ineffective, as she
had used the expert before, and relied on recommendations of
attorneys in the public defender's office."

Judge DeStefano found that "Siegert did not 'completely falsify'
his credentials," as did the "expert" in *Skaggs*. Apparently relying
on Siegert's *Miranda* hearing testimony regarding his background,
the court found he was a licensed psychologist in New Jersey and
New York; he was on staff at three hospitals; and he had assisted
the Public Defender's office numerous times. The court noted that
Siegert was recognized as an expert in two opinions of our court,
citing *State v. M.J.K.,* 369 N.J. Super. 532 (App. Div. 2004),
appeal dismissed, 187 N.J. 74 (2005), as well as *State v. Cox,* No.

A–5883–05 (App. Div. July 18), certif. denied, 196 N.J. 598 (2008).

The judge also found that defendant did not establish prejudice because "there was no testimony given [at trial], by either the defense or the state, regarding [defendant's] competency to waive his *Miranda* rights." The court found it reasonable for defense counsel not to call Siegert, given the potential impeachment, and the trial court's credibility determinations at the *Miranda* hearing.

The court also found that it was not ineffective assistance to fail to request a delay or mistrial to retain another expert as defendant did not demonstrate that a court would have granted a mistrial or continuance. Also, "[d]efendant has also not shown that there was any expert available to examine defendant at the time the decision was made to not call Dr. Siegert to testify." Moreover, the court held that defendant had not demonstrated that expert testimony would be found credible, or there would be a reasonable probability of a different result.

. . . .

*State v. Lane*, No. A-4529-11T1, 2014 WL 3905706, at *1-4 (N.J. Super. App. Div. Aug. 12, 2014).

The Appellate Division then "affirm[ed], substantially for the reasons set forth in Judge DeStefano's written opinion" and provided the following additional comments:

We agree with the trial court that defendant has failed to demonstrate that trial counsel's failure to discover the alleged embellishments of Siegert's credentials rose to ineffective assistance of counsel. Defendant does not challenge the court's findings that regardless of any embellishments, Siegert was a licensed clinical psychologist, had been accepted as an expert in our courts and cited in multiple decisions, and had been utilized by the Office of the Public Defender. "It is all too tempting for a defendant to second-guess counsel's assistance after conviction ... and it is all too easy for a court ... to conclude that a particular act or omission of counsel was reasonable." *Strickland, supra*, 466 U.S. at 689, 104 S.Ct. at 2065, 80 L. Ed.2d at 694. Defendant has not overcome the "strong presumption" that counsel's conduct fell within "the wide range of reasonable professional assistance." *Ibid. See also Skaggs, supra*, 235 F.3d at 268 (stating that in view of trial counsel's familiarity with, and past use of, expert, "counsel's failure to conduct a full-blown investigation into [his] academic

> history, or to verify his credentials any further ... did not fall below an objective standard of reasonableness under Strickland ").[5]
>
> We also agree with the court's determination that defendant has failed to establish a prima facie case of prejudice. Defendant argues that had trial counsel adequately investigated his expert, he would have chosen not to use him. However, defendant provides no competent evidence that even had counsel done so, counsel would have been able to identify another expert who would have offered a helpful opinion of defendant's alleged cognitive limitations. *See State v. Cummings*, 321 N.J. Super. 154, 170 (App. Div.) (stating that "when a petitioner claims his trial attorney inadequately investigated his case, he must assert the facts that an investigation would have revealed, supported by affidavits or certifications based upon personal knowledge"), certif. denied, 162 N.J. 199 (1999). Absent this proof, defendant's claim of prejudice is nothing more than a "bald assertion." *Ibid.*

*Lane*, 2014 WL 3905706, at *4.

Here, as demonstrated above, the Appellate Division thoroughly examined Petitioner's claim of ineffective assistance under the governing law, and it did not unreasonably apply *Strickland* or unreasonably determine the facts in light of the evidence when it found that Petitioner had not established deficient performance or prejudice with respect to this claim. It is most notable that Petitioner offered no evidence that his counsel could have found a qualified expert who would have provided helpful testimony about Petitioner's cognitive limitations. Without such evidence, Petitioner cannot show he was prejudiced by his attorney's failure to

---

[5] The Appellate Division also distinguished the decision in *Skaggs*:

> Although the *Skaggs* court concluded that trial counsel was not ineffective in failing to discover her expert's falsification in the guilt phase of the trial, the court found that the trial counsel's continued use of the expert, in the penalty phase, was ineffective assistance, in view of the expert's previous "bizarre and eccentric" testimony. *Supra*, 236 F.3d at 269. Here, by contrast, trial counsel chose not to continue to use the services of an expert apparently subject to impeachment.

*Lane*, 2014 WL 3905706, at *4 n.2.

investigate Siegert's qualifications or seek a continuance to find a new expert.  The Court therefore denies relief on Ground Two.

### c.  Certificate of Appealability

Pursuant to Local Appellate Rule 22.2 of the Rules of the United States Court of Appeals for the Third Circuit, at the time a final order denying a habeas petition is issued, the district judge is required to make a determination as to whether a certificate of appealability ("COA") should issue.  Having denied the claims in the Petition, the Court will also deny a COA. Pursuant to 28 U.S.C. § 2253(c), a petitioner may not appeal from a final order in a habeas proceeding unless he has "made a substantial showing of the denial of a constitutional right." *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Miller-El v. Cockrell*, 537 U.S. 322 (2003). Because Petitioner has not made a substantial showing of the denial of a constitutional right, the Court will deny a COA.

## IV.  <u>CONCLUSION</u>

For the reasons explained in this Opinion, the Court denies the Petition, ECF No. 1, and also denies a COA.  An appropriate Order follows.


<u>s/Freda L. Wolfson</u>
Freda L. Wolfson
U.S. Chief District Judge

DATED: December 1, 2022.